**UNITED STATES of America**

v.

**Benjamin BALOGUN, Defendant.**

**No. 97–CR–281–01.**

United States District Court,
E.D. New York.

Aug. 4, 1997.

Zachary W. Carter, U.S. Atty., E.D. New York, U.S. Attorney's Office by Michele De-Long, Asst. U.S. Atty., Brooklyn, NY, for U.S.

Michael Padden, The Legal Aid Society, Brooklyn, NY, for Benjamin Balogun.

## MEMORANDUM AND ORDER

GLEESON, District Judge.

Defendant Benjamin Balogun was sentenced on July 18, 1997, for importing heroin into the United States. His sentence includes a three-year period of supervised release which will be suspended upon his exclusion from the United States and resumed if and when Balogun re-enters the United States. The relevant provision of the judgment reads as follows:

> The term of supervised release will commence, pursuant to 18 U.S.C. § 3624(e), on the day the defendant is released from prison. At the conclusion of his prison term, defendant is to be delivered to the INS to be excluded pursuant to the stipulated order of exclusion. The term of supervised release shall be suspended on the day the defendant is excluded. It will resume on the day he re-enters the United States; defendant must report to a United States Probation Officer within 48 hours of his re-entry.

This memorandum and order sets forth the reasons for this aspect of the defendant's sentence.

### FACTS

Benjamin Balogun was born in London and maintains United Kingdom citizenship, but he is a resident of Nigeria, where he has spent the last several years living with his mother and brother. Balogun entered the United States on March 17, 1997, aboard a flight from Uganda. A routine customs examination, which included an x-ray examination of his person, revealed that Balogun had foreign bodies in his intestinal tract. The foreign bodies were 45 balloons containing approximately 385 grams of heroin. On May 1, 1997, Balogun pled guilty to the charge of importing heroin into the United States, in violation of 21 U.S.C. §§ 952(a) and 960(b)(3). His total offense level under the United States Sentencing Guidelines is 17, resulting in a range of imprisonment of 24–30 months.

In his plea agreement, defendant agreed to stipulate to an order of exclusion which will result in his immediate exclusion and deportation to England upon the completion of his jail term. In exchange, the Government, pursuant to a policy it follows in numerous narcotics-related prosecutions of aliens in this district, agreed to recommend a one-level downward departure to reward Balogun for relieving the Immigration and Naturalization Service of the administrative burdens associated with the exclusion and deportation of convicted narcotics traffickers.

At sentencing, I granted the parties' joint request for this one-level downward departure. Balogun was sentenced to a 21–month jail term, to be followed by the three-year term of supervised release that is the subject of this opinion.

Prior to the imposition of sentence, I notified the government and counsel for Balogun of my intention to consider suspending the supervised release term upon Balogun's exclusion, and invited argument on the subject. Balogun opposed any such suspension in an

oral presentation at sentencing, raising some of the concerns addressed below.

## DISCUSSION

### A. The Appropriateness Of The Suspension Of Supervised Release

 Supervised release protects the public from convicted felons and assists those individuals in readjusting to society and learning how to live a life free of criminal activity. *United States v. Crea*, 968 F.Supp. 826, 829 (E.D.N.Y. 1997).

> Supervised release is intended to impose reasonable restrictions on the Defendant's liberty in light of the Defendant's past criminal behavior, to provide the much-needed guidance of a probation officer, and to discourage activity which may lead to further crimes. Supervised release requires a defendant to alter his or her behavior, but compared to imprisonment, the conditions of supervised release impose a very minor infringement on a defendant's liberty.

*Id.*

Balogun is eighteen years old. Given his youthfulness and the seriousness of the offense of conviction, the need for meaningful supervision of him will be especially strong. Although that need will be greatest when he is released from jail, a supervised release term that runs while Balogun is out of the country would be an empty gesture. Balogun will be sent to England, and there is no provision for extraterritorial supervision by the probation officer who will be assigned his case. Thus, there will be no way to monitor his compliance with the terms of his supervised release. In short, it will be supervised release without supervision, which is no deterrent to further criminal conduct and hardly an effective means of helping him readjust to society and lead a law-abiding life. *United States v. Mora*, 22 F.3d 409, 413 n. 6 (2d Cir.1994); *United States v. Isong*, 111 F.3d 428, 431 (6th Cir.1997). As a practical matter, there will be no supervised release term at all; the probation officer explained at sentencing that the Probation Department's file for a defendant like Balogun is simply closed

the moment he is transported out of the country.

 Suspending the period of supervised release and resuming it if and when Balogun chooses to re-enter the country will more likely achieve the goals of supervision. It will enhance the prospects that his transition back into our society will be a smooth one, in which he receives the necessary guidance and oversight to avoid criminal activity and become a productive member of society. In turn, this will help to protect the public from potential harm. The benefits to be realized from making the period of supervised release meaningful far outweigh the infringement on the defendant's liberty.

Balogun suggests that it would be unfair to subject him to a term of supervised release at some indefinite future time and to require him to report to a probation officer within 48 hours of any re-entry into the United States. I see no unfairness in this requirement. If Balogun returns to this country, he will do so either legally or illegally. If he returns legally,[1] the requirement that he announce his presence and subject himself to supervision is hardly onerous. After all, Balogun has been convicted of a serious narcotics offense. There is no reason to believe that he will have received any supervision outside the United States, and good reason to believe that a period of supervised release will serve its usual salutary purposes despite the passage of time. Moreover, I doubt that such supervision will deter Balogun from seeking lawful re-entry. In any event, even if he considers the prospect of supervised release a burden, it is no greater burden than that imposed on our own citizens who are convicted and sentenced for the same or similar offenses.

Balogun argues that his prospects for obtaining permission to re-enter are diminished because he will have to disclose to the immigration authorities in any future application the existence of the supervised release term. I disagree. Balogun will no doubt be required to reveal that he is a convicted drug trafficker. The fact that he will be subject to

---

1. If Balogun wishes to re-enter the United States, he cannot do so unless the Attorney General has expressly consented to his reapplication for admission. 8 U.S.C. § 1326(a)(2).

supervision immediately upon re-entering the United States is likely to be looked upon favorably by the immigration officials who pass on his application for permission to re-enter.

I have no doubt that the reporting requirement upon reentry may deter Balogun from *illegally*[2] re-entering the United States. Of course, he is not likely to report to a probation officer as required if he enters illegally. Then, if he is later found, he will be subject both to a violation of his supervised release (for not reporting) and to a separate prosecution for illegal re-entry.[3] However, the fact that a supervised release term such as the one imposed here may deter convicted drug traffickers from illegally re-entering the United States is hardly a reason not to impose it.

Finally, Balogun contends that the suspension of the supervised release is inappropriate for administrative reasons, as it will result in lingering files which will remain open indefinitely. However, it is no more burdensome than what happens when individuals on supervised release are incarcerated for a number of years, during which time their supervised release period is suspended. *See* 18 U.S.C. § 3624(e). Presumably, probation officers already have closed files and suspended files. The only apparent administrative repercussion of the suspension of Balogun's supervised release will be that his file will be suspended rather than closed. I fail to see any administrative difficulty in this, let alone an insurmountable one.

## B. *The Authority To Impose A Suspended Period Of Supervised Release*

Title 18, United States Code, Section 3583, provides for the inclusion of a term of super-vised release after imprisonment. Factors to be considered by a sentencing court are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed—... (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. §§ 3583(c) and 3553(a)(1)-(2). The section prescribes certain conditions of supervised release and authorizes a court to "order, as a further condition of supervised release, ... any other condition it considers to be appropriate." 18 U.S.C. § 3583(d).

The imposition of supervised release is permissive under § 3583 unless another statute mandates it. There is such a mandate here: 21 U.S.C. § 960(b)(3) states that "[a]ny sentence imposing a term of imprisonment under this paragraph *shall*, in the absence of such a prior conviction, impose a term of supervised release of at least 3 years in addition to such term of imprisonment" (emphasis added). Accordingly, the imposition of supervised release is mandatory in this case.

■ The Sentencing Guidelines confer broad discretion on sentencing courts "to tailor conditions of supervised release to the goals and purposes outlined in § 5D1.3(b)," which mirror the statutory factors quoted above. *United States v. Abrar*, 58 F.3d 43, 46 (2d Cir.1995); *Isong*, 111 F.3d at 430 (district courts have "broad discretion to fashion appropriate conditions of supervised release").

**2.** When a previously deported alien "enters, attempts to enter, or is at any time found in, the United States" without the express consent of the Attorney General, it is a crime. *See* 8 U.S.C. § 1326. Unlawful re-entry is punishable by a fine under Title 18, imprisonment of not more than 2 years, or both. *Id.* If Balogun violates this law, he will be subject to an even higher penalty as his "removal was subsequent to a conviction for commission of an aggravated felony," and it will result in a fine, imprisonment of not more than twenty years, or both. 8 U.S.C.

§ 1326(b)(2). Trafficking in a controlled substance is an aggravated felony. 8 U.S.C. § 1101(a)(43)(B).

**3.** Statistics reveal a trend toward increased prosecution of illegal re-entry. *See* James P. Fleissner & James A. Shapiro, *Federal Sentences for Aliens Convicted of Illegal Reentry Following Deportation: Who Needs the Aggravation?*, 9 Geo. Immigr. L.J. 451, 478 n. 2 (1995).

As for the time period of the supervised release term, 18 U.S.C. § 3624(e) requires that "[a] term of supervised release commences on the day the person is released from imprisonment." The special condition I have imposed is in accord with this provision, as Balogun's term of supervised release commences at the conclusion of his prison term and will be suspended upon his exclusion from the United States. Section 3624(e) further provides that supervised release "does not run during any period in which the person is imprisoned in connection with a conviction for a Federal, State, or local crime unless the imprisonment is for a period of less than 30 consecutive days." Balogun argues that since there is no analogous provision tolling supervised release upon deportation, such tolling is implicitly unauthorized. *See Isong,* 111 F.3d at 431–432 (Moore, J., dissenting). This argument is based on the *expre unius est exclusio alterius* [4] principle of statutory construction. However, the Supreme Court has observed that such principles "long have been subordinated to the doctrine that courts will construe the details of an act in conformity with its dominating general purpose." *Herman & MacLean v. Huddleston,* 459 U.S. 375, 387 n. 23, 103 S.Ct. 683, 690 n. 23, 74 L.Ed.2d 548 (1983) (quoting *SEC v. Joiner Leasing Corp.,* 320 U.S. 344, 350–351, 64 S.Ct. 120, 123, 88 L.Ed. 88 (1943)). The underlying purpose of supervised release would be thwarted were I to rely on an overly rigid reading of the statute. Application of the principle advanced by Balogun is improper "where the remedial purposes of the [Act] would be undermined by a presumption of exclusivity." *Id.,; see also Illinois, Dep't of Pub. Aid v. Schweiker,* 707 F.2d 273, 277 (7th Cir.1983) ("not every silence is pregnant; *expressio unius est exclusio alterius* is therefore an uncertain guide to interpreting statutes"); Cass R. Sunstein, *Law and Administration After Chevron,* 90 Colum. L. Rev. 2071, 2120 n. 182 (1990) ("[the] canon is a questionable one in light of the dubious reliability of inferring specific intent from silence"). There is no reason to believe that Congress thought about deportation and exclusion in formulating the law in this area.

I believe that the explicit provision for tolling while a person is in jail lends support to the condition I have imposed. The rationale for suspending supervised release upon incarceration is equally applicable in the context of deportation and exclusion.

> Imprisonment and supervised release serve different purposes. The primary purpose of supervised release is to ease the defendant's transition into the community, or, when a defendant has spent a fairly short time in prison, to provide rehabilitation. Unlike prison, supervised release is not intended to punish or incapacitate the defendant.... Because of the distinct functions of prison and supervised release, the statute provides clearly that a person's term of supervised release does not begin until the person has been released from prison and does not run while a person is in prison.

*Quinones v. United States,* 936 F.Supp. 153, 155 (S.D.N.Y.1996). Because the objectives of supervised release cannot be attained while an individual is in prison, the statute tolls the period of supervised release when a person is incarcerated. Similarly, as discussed above, the goals of supervised release cannot be realized when a defendant is not present in the United States. Given the sentencing court's breadth of discretion, I believe that I am authorized to impose the condition at issue here in order to fulfill the purposes supervised release is designed to accomplish.

### CONCLUSION

For the reasons set forth above, I impose a period of supervised release which will be tolled when the defendant is excluded from the country and will resume if and when he reenters it.

So Ordered.

---

4. "[T]he expression of one thing is the exclusion of another." Black's Law Dictionary 581 (6th ed.1990).